1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                                          )
In re F5 NETWORKS, INC. DERIVATIVE      )
LITIGATION.                                              )
                                                          )
                                                          )
                                                          )
_____)

Master File No. C06-794RSL

ORDER GRANTING NOMINAL
DEFENDANT F5 NETWORKS, INC.'S
MOTION TO DISMISS FOR FAILURE
TO MAKE DEMAND

## I.  INTRODUCTION

This matter comes before the Court on nominal defendant "F5 Networks, Inc.'s Motion to Dismiss for Failure to Make Demand" (Dkt. #49).  In its motion, nominal defendant F5 Networks, Inc. ("F5") requests dismissal of plaintiffs' derivative complaint because plaintiffs did not make a pre-litigation demand on F5's board of directors and plaintiffs have failed to plead particularized facts showing that demand was excused as futile.  The Court held a hearing on the motion on August 1, 2007 and heard oral argument from counsel for plaintiffs and defendant F5. For the reasons set forth below, the Court grants defendant F5's motion to dismiss.

## II.  DISCUSSION

### A.    Background

This action arises out of the recent publicity focused on companies that allegedly backdated stock options as a form of compensation to high-level executives.  On May 16, 2006, the Center for Financial Research and Analysis ("CFRA") issued a report entitled "Options

Backdating, Which Companies Are At Risk?" in which CFRA reviewed the option prices of 100

public companies and, based upon an analysis of the exercise prices of option grants with

reference to the companies' stock prices, concluded that 17% of the subject companies, were in

CFRA's view, "at risk for having backdated option grants during the period 1997 to 2002." See

Dkt. #54, Ex. 1 (F5's Form 10-K/A filed with the SEC on December 12, 2006) at 20.[1]  F5 was

one of the 17 companies so identified.  Id.; see also James Bandler et al., Criminal Probe Of

UnitedHealth's Options Begins, Wall St. J., May 18, 2006, at C1 ("An accounting-research firm

this week identified 17 companies it termed as having 'the highest risk of having backdated

options.'").  Shortly thereafter, F5 announced that it had received a grand jury subpoena from

the Eastern District of New York and a notice of informal inquiry from the Securities and

Exchange Commission ("SEC").  See Dkt. #54, Ex. 1 at 10.  This set off a rush to the

courthouse.

### 1.     Procedural history

Last year, there were a total of six F5 related shareholder derivative actions pending

before this Court:  (1) Hutton v. McAdam, et al. (Case No. C06-794RSL); (2) Wright v.

Amdahl, et al. (Case No. C06-872RSL); (3) Adams v. Amdahl, et al. (Case No. C06-873RSL);

(4) Locals 302 and 612 of the Int'l Union of Operating Eng'rs-Employers Constr. Indus. Ret.

Trust v. McAdam, et al. (Case No. 06-1057RSL) (hereinafter "Locals Trust"); (5) Easton v.

McAdam, et al. (Case No. C06-1145RSL); and (6) Sommer v. McAdam, et al. (Case No. C06-

1229RSL).  On September 12, 2006, the Court remanded the Wright and Adams actions to King

County Superior Court, and on September 28, 2006, the Court signed an order granting the

parties' stipulation for remand in Sommer.  See Dkt. #22 in C06-872; Dkt. #34 in C06-873; and

---

[1]  Under Fed. R. Evid. 201, the Court takes judicial notice of this document, as well as F5's stock prices and documents filed with the SEC.  See Dkt. #67 (Order Granting In Part and Denying In Part Plaintiffs' Motion for Judicial Notice).

Dkt. #18 in C06-1229.  <u>Wright</u>, <u>Adams</u>, and <u>Sommer</u> were consolidated in King County Superior Court before the Honorable William L. Downing and have been stayed pending the federal court actions (<u>see</u> King County Superior Court Nos. 06-2-17195-1SEA; 06-2-19159-5SEA; and 06-2-26248-4SEA).  On October 2, 2006, the Court signed an order on the parties' stipulation in <u>Hutton</u>, <u>Locals Trust</u>, and <u>Easton</u>, consolidating these actions for all purposes, appointing lead plaintiff and lead counsel, and setting the schedule for filing a consolidated complaint.  <u>See</u> Dkt. #37 in C06-794.  Under this order, Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust (hereinafter "Locals 302 and 612" or "lead plaintiff") was appointed lead plaintiff charged with filing a consolidated complaint.  <u>Id.</u> at 3.  On November 20, 2006, lead plaintiff filed a "Consolidated Verified Shareholders Derivative Complaint" (Dkt. #39) (hereinafter the "Complaint"), which is now the operative pleading in this matter.

On February 2, 2007, the parties in this consolidated action filed a joint motion to establish a briefing schedule for motions directed at the Complaint (Dkt. #45).  Based on this motion, the Court set a bifurcated briefing schedule for motions to dismiss, requiring submission of motions to dismiss based on demand futility prior to the filing of other Fed. R. Civ. P. 12 dismissal motions.  <u>See</u> Dkt. #46.  Pursuant to this order, on February 28, 2007, defendant F5 filed a motion to dismiss for failure to make demand, which is now pending before the Court for consideration.  <u>See</u> Dkt. #49 (hereinafter "Motion").

### 2.    The parties

Lead plaintiff Locals 302 and 612, plaintiff Glenn Hutton, and plaintiff Allen Easton are, and have been at relevant times, current shareholders of F5.  <u>See</u> Complaint at ¶22.

Nominal defendant F5 is incorporated in the State of Washington and has its principal place of business in Seattle.  <u>Id.</u> at ¶25.  F5 provides application delivery networking products that improve the performance, availability and security of applications running on networks using the Internet Protocol (IP).  <u>Id.</u>  As described below, the individual defendants are current

and former F5 officers and directors.

### a.    F5's Board of Directors at the time of the lawsuit's filing

Plaintiffs first filed suit on June 8, 2006.  Id. at ¶152.  At that time, F5's board consisted of six directors who have been named as individual defendants in this action:  (1) John McAdam; (2) Alan Higginson; (3) Karl Guelich; (4) Keith Grinstein; (5) Rich Malone; and (6) Gary Ames.  Id.

Defendant John McAdam has been F5's CEO, President and a director since 2000.  See Complaint at ¶26.  Plaintiffs allege that as an executive and director, Mr. McAdam authorized, approved and or/received the backdated stock options at issue in this case, including at least 1,255,000 backdated options worth at least $13.9 million, and has sold at least 1.2 million shares of his personal F5 stock, for unlawful insider trading proceeds of at least $42.9 million.  Id.

Defendant Alan Higginson has been F5's Chairman since April 2004 and a director since May 1996, and has also served as a member of F5's Audit and/or Compensation Committees since 1999.  Id. at ¶28.  Plaintiffs allege that as a director, Mr. Higginson authorized, approved and/or received the backdated stock options at issue in this case, including at least 67,500 backdated options worth at least $972,900, and has sold at least 156,300 shares of his personal F5 stock, for unlawful insider trading proceeds of at least $6.6 million.  Id.

Defendant Karl Guelich has been an F5 director since June 1999, and has also served as a member of F5's Audit and/or Compensation Committees since 1999.  Id. at ¶29.  Plaintiffs allege that as a director, Mr. Guelich authorized, approved and/or received the backdated stock options at issue in this case, including at least 67,500 backdated options worth at least $972,900, and has sold at least 70,880 shares of his personal F5 stock, for unlawful insider proceeds of at least $3.1 million.  Id.

Defendant Keith Grinstein has been an F5 director since December 1999, and has also served as a member of F5's Audit and/or Compensation Committees since 1999.  Id. at ¶30. Plaintiffs allege that as a director, Mr. Grinstein authorized, approved and/or received the

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND          -4-

backdated stock options at issue in this case, including at least 67,500 backdated options worth at least $972,900, and has sold at least 62,500 shares of his personal F5 stock, for unlawful insider proceeds of at least $2.8 million.  Id.

Defendant Rich Malone has been an F5 director since August 2003.  Id. at ¶31.  Plaintiffs allege that as a director, Mr. Malone assisted in the preparation of F5's annual and quarterly reports, and reviewed, approved and helped to prepare each proxy statement issued since August 2003; and signed F5's annual financial reports for fiscal years 2003-2005, which must now be restated to correct for accounting irregularities caused by the backdated options at issue in this case.  Id.

Defendant Gary Ames has been a director of F5 since July 2004, and has also served as a member of F5's Compensation Committee since 2004.  Id. at ¶32.  Plaintiffs allege that as a director, Mr. Ames assisted in the preparation of F5's annual and quarterly reports, and reviewed, approved and helped to prepare each proxy statement issued since July 2004; and signed F5's annual financial reports for fiscal year 2004-2005, which must now be restated to correct for accounting irregularities caused by the backdated options at issue in this case.  Id. Plaintiffs further allege that Mr. Ames has sold at least 10,000 shares of his personal F5 stock, for unlawful insider trading proceeds of at least $548,800.  Id.

### b.  F5's Officers

The following defendants were F5 officers as of the time the complaint was filed:

Defendant Joann Reiter served as Vice President of F5 since 2000, Corporate Secretary since July 1999, and as General Counsel since 1998.  Id. at ¶33.  Plaintiffs allege that Ms. Reiter resigned on or about November 8, 2006 following disclosures of the issues in this case.  Id. Plaintiffs also allege that as an executive, Ms. Reiter authorized, approved and/or received the backdated stock options at issue in this case, including at least 177,916 backdated options worth at least $2.6 million, and has sold at least 226,491 shares of her personal F5 stock, for unlawful insider proceeds of at least $8.4 million.  Id.

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND                -5-

Defendant Tom Hull has been F5's Senior Vice President of Worldwide Sales since October 2003. Id. at ¶38. Plaintiffs allege that as an executive of F5, Mr. Hull authorized, approved and/or received the backdated options at issue in this case, including 40,000 backdated options worth at least $1.01 million, and has sold at least 50,000 shares of his F5 stock, for unlawful insider trading proceeds of at least $892,000. Id.

Defendant Edward Eames has been F5's Senior Vice President of Business Operations since January 2001 and served as Vice President of Professional Services from October 2000 to January 2001. Id. at ¶40. Plaintiffs allege that as an executive of F5, Mr. Eames authorized, approved and/or received the backdated options at issue in this case, including 165,000 backdated options worth at least $1.9 million, and sold at least 386,146 shares of his F5 stock, for unlawful insider trading proceeds of at least $16.6 million. Id.

Defendant Andy Reinland has been F5's Senior Vice President and Chief Financial Officer since October 25, 2005, and previously served as Vice President of Finance. Id. at ¶41. Plaintiffs allege that as an executive of F5, Mr. Reinland authorized, approved and/or received the backdated stock options at issue in this case, and sold at least 18,933 shares of his personal F5 stock, for unlawful insider trading proceeds of at least $1.1 million. Id.

Defendant John Rodriguez has been F5's Senior Vice President and Chief Accounting Officer since October 25, 2005 and Controller since 2001. Id. at ¶43. Plaintiff alleges that as an executive, Mr. Rodriguez authorized, approved and/or received the backdated stock options at issue in this case, and sold at least 10,287 shares of his personal F5 stock, for unlawful insider trading proceeds of at least $595,564. Id.

### c.    F5's Former Officers and Directors

The following defendants are former F5 officers and directors:

Defendant Carlton Amdahl served as an F5 director from at least May 1998 to January 2001, and also as Chief Technical Officer from at least February 2000 to January 2001. Id. at ¶34. Plaintiffs allege as a director, Mr. Amdahl authorized, approved and/or received the

backdated stock options at issue in this case, including 487,500 backdated options worth at least $35.5 million, and has sold at least 10,000 shares of his F5 stock, for unlawful insider trading proceeds of at least $520,300.  Id.

Defendant Steven Goldman served as F5's Senior Vice President of Sales and Services from July 1997 to July 1999.  Id. at ¶35.  Plaintiffs allege that as an executive, Mr. Goldman authorized, approved and/or received the backdated stock options at issue in this case, including 215,000 backdated options worth at least $2.3 million, and has sold at least 352,500 shares of his F5 stock, for unlawful insider trading proceeds of at least $10.5 million.  Id.

Defendant Brett Helsel served as F5's Vice President of Product Development and Chief Technology Officer from May 1998 to February 2000 and as Senior Vice President of Product Development from February 2000 until his resignation.  Id. at ¶36.  Plaintiffs allege that as an executive, Mr. Helsel authorized, approved and/or received the backdated stock options at issue in this case, including 80,000 backdated options worth at least $660,000, and has sold at least 289,703 shares of his F5 stock, for unlawful insider trading proceeds of at least $8.2 million.  Id.

Defendant Jeff Pancottine served as F5's Senior Vice President and General Manager since 2004 and as Senior Vice President of Marketing and Business Development since October 2000.  Id. at ¶37.  Plaintiffs allege that as an executive, Mr. Pancottine authorized, approved and/or received the backdated stock options at issue in this case, including 265,000 backdated options worth at least $3.4 million, and has sold at least 475,878 shares of his F5 stock, for unlawful insider trading proceeds of at least $19.1 million.  Id.

Defendant Steven Coburn served as F5's Vice President of Finance and Chief Financial Officer from May 2001 to 2005.  Id. at ¶39.  Plaintiffs allege that as an executive, Mr. Coburn authorized, approved and/or received the backdated options at issue in this case, including 165,000 backdated options worth at least $2.6 million, and sold at least 365,000 shares of his F5 stock, for unlawful insider trading proceeds of at least $14.9 million.  Id.

Defendant Jeffrey Hussey served as F5's Chairman from 1996 to 2002, and as CEO from

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND                     -7-

1    January 1996 to July 2000.  Id. at ¶42.  Plaintiffs allege that as a director and executive, Mr.

2    Hussey authorized, approved and/or received the backdated stock options at issue in this case,

3    including 70,000 backdated options worth at least $490,000, and sold at least 478,000 shares of

4    his F5 stock, for unlawful insider trading proceeds of at least $25.8 million.  Id.

5    **B.    Analysis**

6        **1.    The demand futility standard**

7        The purpose of a derivative action is to "place in the hands of the individual shareholder a

8    means to protect the interests of the corporation from the misfeasance and malfeasance of

9    faithless directors and managers."  Kamen v. Kemper Fin. Serv., Inc., 500 U.S. 90, 95 (1991)

10   (quotation marks and citation omitted).  To prevent abuse of this remedy, however, shareholder

11   derivative complaints are governed by the pleading requirements of Fed. R. Civ. P. 23.1, which

12   states, in part:  "[t]he complaint shall also allege with particularity the efforts, if any, made by

13   the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority .

14   . . and the reasons for the plaintiff's failure to obtain the action or for not making the effort."  Id.

15   In this case, plaintiffs do not allege that they made a demand on F5's board of directors.

16   Instead, plaintiffs claim that demand was excused because it would have been futile.  See Dkt.

17   #39 at ¶154 ("A pre-filing demand would be a useless and futile act").

18       "[A] court that is entertaining a derivative action . . . must apply the demand futility

19   exception as it is defined by the law of the State of incorporation."  Kamen, 500 U.S. at 108-

20   109; In re Silicon Graphics Inc. Securities Litig., 183 F.3d 970, 990 (9th Cir. 1999) ("For

21   [demand futility] standards, we turn to the law of the state of incorporation").  F5 was

22   incorporated in Washington State, so Washington law applies on this issue.  Washington has a

23   procedural demand requirement set forth in RCW 23B.07.400(2), "Derivative proceedings

24   procedure," which states:

25       A complaint in a proceeding brought in the right of a corporation must be verified
         and allege with particularity the demand made, if any, to obtain action by the
26       board of directors and either that demand was refused or ignored or why a demand

was not made.  Whether or not a demand for action was made, if the corporation commences an investigation of the charges made in the demand or complaint, the court may stay any proceeding until the investigation is complete.

Although RCW 23B.07.400(2) sets forth the procedural demand requirement, Washington courts have neither interpreted this provision nor adopted a substantive demand requirement.  See Kamen, 500 U.S. at 96 ("[T]he demand doctrine . . . clearly is a matter of 'substance' not 'procedure.'").  But, it is clear under Washington law that "[d]erivative suits are disfavored and may be brought only in exceptional circumstances."  Haberman v. Wash. Pub. Power Supply Sys., 109 Wn.2d 107, 147 (1987).

In the absence of Washington substantive law on demand futility, Judge Zilly of this Court previously concluded that "the Washington State Supreme Court would likely adopt the substantive demand requirement and apply a similar, if not the same, exception for futility as that employed in Delaware."  See In re Cray, 431 F. Supp. 2d 1114, 1120 (W.D. Wash. 2006); accord Schwartzman v. McGavick, 2007 U.S. Dist. Lexis 28962, at *12 (W.D. Wash. April 19, 2007) (citing In re Cray, 431 F. Supp. 2d at 1120 and following Delaware law given the parties' agreement); Fernandes v. Bianco, 2006 U.S. Dist. Lexis. 42048, at *7 (W.D. Wash. June 22, 2006) (same).

Following In re Cray, the parties agree that Delaware's substantive demand requirement is persuasive authority here.  See Motion at 10 ("In Aronson, the Delaware Supreme Court created a two-pronged test for analyzing a claim of demand futility (a test that this Court adopted in Cray, 431 F. Supp. 2d at 1121).");  Response at 9 ("In determining the futility of demand, Washington State courts apply Delaware law.") (citing In re Cray, 431 F. Supp. 2d at 1119).

Delaware law has two tests for demand futility.  Under the first test announced in Aronson v. Lewis, 473 A.2d 805 (Del. 1984), if a derivative suit challenges a decision made by the board of directors, then demand is excused if plaintiffs "allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged

transaction was otherwise the product of a valid exercise of business judgment." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d at 989 (citing Aronson, 473 A.2d at 814); In re CNET Networks, Inc. S'holder Derivative Litig., 483 F. Supp. 2d 947, 954 (N.D. Cal. 2007).  A second test under Rales v. Blasband, 634 A.2d 927 (Del. 1993), applies where the directors did not make a decision:  "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." In re CNET, 483 F. Supp. 2d at 954 (quoting Rales, 634 A.2d at 934).  Plaintiffs' core allegations in this case are based on the directors' actions, such as receiving backdated options, preparing and signing proxy statements, and falsely reporting financial statements.  Therefore, the Aronson v. Lewis test for demand futility applies here.

The Aronson test has two parts:  the first part examines whether directors are disinterested and independent, and the second part examines whether the transaction at issue was a valid exercise of the board's business judgment.  See Aronson, 473 A.2d at 814.  In the first part of the test, disinterestedness and independence must be examined separately, because a lack of independence by a majority of the board may by itself excuse a derivative plaintiff from making demand.  See Rales, 634 A.2d at 936.  Accordingly, in the analysis below, the Court examines separately whether plaintiffs have established reasonable doubt that:  (1) the directors are disinterested; (2) the directors are independent; and (3) whether the transactions at issue were valid exercises of business judgment.

But, before turning to the Aronson test, the Court highlights the fact that its determination of whether or not demand is excused as futile is determined as of the time the complaint was filed.  See Rales, 634 A.2d at 934 ("Thus, a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt . . . as of the time the complaint is filed[.]") (emphasis added).  At the time the Complaint was

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND              -10-

filed on June 8, 2006,[2] the F5 Board consisted of six directors:  (1) John McAdam, (2) Alan
Higginson, (3) Karl Guelich, (4) Keith Grinstein, (5) Rich Malone, and (6) Gary Ames.
(hereinafter referred to as the "Director Defendants").  If plaintiff shows that three of these
Director Defendants are not independent or disinterested, demand is excused as futile.  See
Beam v. Stewart, 845 A.2d 1040, 1046 n.8 (Del. 2004) ("If three directors of a six person board
are not independent and three directors are independent, there is not a majority of independent
directors and demand would be futile." (citing Beneville v. York, 769 A.2d 80, 85-86 (Del. Ch.
2000) (holding that demand is excused where a board is evenly divided between interested and
disinterested directors)).

> **2.    Is there reasonable doubt that F5's Director Defendants are disinterested?**

Plaintiffs allege that F5 executives impermissibly "backdated" stock option grants.  A
stock option gives the holder the right, but not the requirement, to purchase stock at a certain
price – the "strike" or "exercise" price.  When the strike price of an option is set at the stock's
closing price on the date of the option grant, the option is "at the money," or has no immediate
value on the grant date, because the exercise price and the stock price are the same.

The crux of this case is plaintiffs' claim that defendants did not set the strike price on the
same day the options were granted.  Instead, plaintiffs allege that defendants engaged in a
"backdating scheme" by looking back with 20/20 hindsight to link strike prices to dates when
F5's stock closed at relative lows.  If this allegation is proven true, the stock options at issue
would have been "in the money" and had immediate value to defendants subject to any vesting
requirements, because the strike price was known to be below the then-current price of F5's
stock.  While there is nothing per se impermissible with "in the money options,"[3] "[i]ntentionally

---

[2]  The Hutton v. McAdam, et al. complaint was filed on June 8, 2006.  See C06-794RSL at Dkt.
#1.

[3]  See In re Computer Sci. Corp. Derivative Litig., 2007 U.S. Dist. Lexis 25414, at *7 (C.D. Cal.
Mar. 27, 2007) ("[T]he practice [of granting "in the money options"] is not improper, in and of itself,

employing hindsight to adjust the grant date to an advantageously low price, or 'backdating,' is fraud.".  In re CNET Networks, Inc., 483 F. Supp. 2d at 956.

To succeed on their backdating theory at trial, plaintiffs will have to show that the stock options at issue were in fact "backdated."  Here, however, the case is at the pleading stage on defendant's motion to dismiss, so in response to defendant's motion, plaintiffs only have to present particularized facts creating reasonable doubt that the directors are disinterested. Plaintiffs' core contentions on this point are that the Director Defendants are not disinterested because they received backdated options.  See Complaint at ¶153; Response at 24.

Plaintiffs allege that grants made on twelve dates between 1999 and 2004 were backdated:  (1) October 1, 1999; (2) February 10, 2000; (3) July 24, 2000; (4) January 1, 2001; (5) March 16, 2001; (6) April 20, 2001; (7) April 27, 2001; (8) May 6, 2002; (9) February 13, 2003; (10) May 8, 2003; (11) April 29, 2004; and (12) April 30, 2004.  See Complaint at ¶9.  At the time the Complaint was filed, F5's board of directors consisted of Messrs. McAdam, Higginson, Guelich, Grinstein, Malone, and Ames.

Of the twelve grants plaintiffs allege were backdated, at least three of these Director Defendants received grants dated:  (1) January 1, 2001; (2) April 20, 2001; (3) May 6, 2002; (4) February 13, 2003; and (5) April 29, 2004.[4]  Directors are considered interested for purposes of

---

provided it is:  1) fully disclosed to necessary parties, including securities and tax authorities, corporate directors and shareholders; 2) properly accounted for under Generally Accepted Accounting Principles ('GAAP') in the company's financial disclosures to shareholders, the SEC and other regulatory agencies; 3) correctly taxed at both the company and grantee levels; and 4) permitted under the company's bylaws and/or shareholder-approved stock option plans.").

[4]  Plaintiffs allege that John McAdam received backdated options in grants dated July 24, 2000; January 1, 2001; March 16, 2001; April 27, 2001; May 6, 2002; May 8, 2003; and April 30, 2004.  See Complaint at ¶9.  Plaintiffs allege that Alan Higginson received backdated options in grants dated: January 1, 2001; April 20, 2001; May 6, 2002; February 13, 2003; and April 29, 2004.  Id.  Plaintiffs allege that Karl Guelich received backdated options in grants dated: January 1, 2001; April 20, 2001; May 6, 2002; February 13, 2003; and April 29, 2004.  Id.  Plaintiffs allege that Keith Grinstein received backdated options on grants dated: January 1, 2001; April 20, 2001; May 6, 2002; February 13, 2003;

determining demand futility when they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." Aronson, 473 A.2d at 812. If plaintiffs plead with particularity that the option grants on any of these five days were backdated, a majority of the board would not be considered disinterested because they would have received a personal benefit not equally shared by the stockholders, and demand on F5 would be excused as futile. See Beam, 845 A.2d at 1049 ("A director's interest may be shown by demonstrating a potential personal benefit or detriment to the director as a result of the decision."). Therefore, the Court examines whether plaintiffs have pleaded facts with particularity creating reasonable doubt at the pleading stage that the Director Defendants are not disinterested because they received backdated option grants.

### a.    Option grants dated January 1, 2001

Plaintiffs allege that directors Higginson, Geulich, and Grinstein were granted 7,500 options, and director McAdam was granted 100,000 options dated January 1, 2001 at an exercise price of $9.50. See Complaint at ¶65.[5] For directors Higginson, Geulich, and Grinstein, 100% of the options vested immediately.[6] See Dkt. #60, Ex. F.[7] Directors Higginson, Geulich, and

and April 29, 2004. Plaintiffs have not alleged that Rich Malone or Gary Ames received the backdated options at issue in this case. Id.

[5] Plaintiffs also allege that defendants Goldman, Helsel, Pancottine, and Reiter received options dated January 1, 2001. See Complaint at ¶65.

[6] In its reply, defendant asserts that "it can reasonably be argued that vesting requirements effectively defeat any incentive to 'backdate' because those requirements negate the ability to guarantee a profit to option recipients." See Reply at 12 (emphasis in original). The Court does not need to reach the merits of this argument because the options received by directors Higginson, Geulich, and Grinstein vested 100% on the grant dated and therefore could be "immediately exercised and the 'windfall' captured." Id. at 11; Dkt. #60, Exs. F, H, J, K, M.

[7] Defendant McAdam's January 1, 2001 options vested 50% after one year from the grant date and 50% after the second year. See Dkt. #60, Ex. F.

Grinstein filed Form 4's for the January 1, 2001 grants with the SEC on March 5, 2001.  Id.  On

this March 5, 2001 disclosure date, F5's stock closed at $6.81, which was $2.69 lower than the

stock price on the grant date.  Id., Ex. B.  In fact, F5's stock closed lower than the $9.50 strike

price in the eight trading dates leading up to March 5, 2001, when directors Higginson, Geulich,

and Grinstein filed their Form 4's with the SEC.  Id.  Therefore, by the time the grants dated

January 1, 2001 were reported to the SEC, the options were significantly "out of the money."  If

the directors were attempting to backdate their options as plaintiffs allege, it is extremely

unlikely that the directors would have looked into the past with 20/20 hindsight and chosen

January 1, 2001 as a grant date when the price was $2.69 higher than March 5, 2001, the day on

which the options were recorded with the SEC.  This decrease between the grant date and the

SEC filing date undermines plaintiffs' allegations that the January 1, 2001 grants were

backdated.

### b.    Option grants dated April 20, 2001

Plaintiffs allege that directors Higginson, Geulich, and Grinstein were granted 15,000

options dated April 20, 2001 at an exercise price of $8.10.  See Complaint at ¶67.  These options

vested immediately.  See Dkt. #60, Ex. H.  Directors Higginson, Geulich, and Grinstein filed

their Form 4's for the April 20, 2001 grants with the SEC on May 3, 2001.  There were eight

trading days between April 20, 2001 and May 3, 2001.  See Dkt. #60, Ex. B.  On seven out of

eight of these trading days, F5's stock closed lower than the April 20, 2001 grants' strike price.

Id.   In fact, on April 25, 2001 and April 27, 2001, F5's stock closed at $7.00, $1.10 lower than

the April 20, 2001 option price.  Id.  In support of their claim that the grant dated April 20, 2001

was backdated, plaintiffs assert in the Complaint that: "[t]he [$8.10] exercise price was one of

the lowest closing prices for the month of April 2001."  Complaint at ¶32 (emphasis in original).

This allegation by plaintiffs, however, is a complete misrepresentation of the facts.  The April

20, 2001 closing price of $8.10 was the second highest closing price for the month of April

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND           -14-

2001.[8]  Only on April 19, 2001 when the stock closed at $8.55, did F5's stock close higher during the month of April 2001.  Had the directors truly backdated their options during this time as plaintiffs suggest, the directors would have likely chosen April 4, 2001 as a grant date, when F5's stock closed at only $3.75 a share, or any of the seven days between April 20 and May 3, 2001 when F5's stock closed below $8.10.  Id.  Accordingly, plaintiffs have not pleaded particularized facts showing that the April 20, 2001 grants were backdated.

### c.  Option grants dated May 6, 2002

Plaintiffs allege that directors Higginson, Guelich, and Grinstein were granted 15,000 options each, and director McAdam was granted 100,000 options, dated May 6, 2002 with an exercise price of $11.12.  See Complaint at ¶69.  These options vested immediately.  See Dkt. #60, Ex. J.  Directors McAdam, Higginson, Geulich, and Grinstein filed Form 4's for the May 6, 2002 grants with the SEC on June 4, 2002.  Id.  On the day of the Form 4 filing, F5's stock closed at $11.93, which plaintiffs allege represents a 7.2% cumulative return based on the exercise price.  See id. at Ex. B; Complaint at ¶69.  Plaintiffs also allege that "[j]ust three days after the grant, the stock price soared to $11.77 per share, a 5.8% increase" and that "the exercise price was the lowest closing price for the stock in the month of May 2002."  Id. (emphasis in original).

In response to these allegations, defendant asserts that the grants dated May 6, 2002 were issued under F5's "1998 Equity Incentive Plan" and this plan allows for grants of "in the money" options.  See Dkt. #60, ¶18 and Ex. Q; see also Complaint at ¶90 (quoting F5's 2003

---

[8]    Plaintiffs are admonished for their misrepresentation of F5's April 20, 2001 stock price in the chart on page 33 of the Complaint.  Based on the location of the arrow in this chart purportedly indicating the April 20, 2001 grant, it appears as if the April 20, 2001 grant was at a significant trough in price and suggests F5's stock closed below $7.50 on April 20th.  In fact, F5's stock closed at $8.10 on April 20, 2001 and was not a relative low point at all.  F5's stock actually closed lower in the 7 trading days following April 20, 2001.  Had the arrow indicating the April 20, 2001 grant been properly located on the chart, it would show that the April 20, 2001 closing price was actually on a "peak" in the graph, not a valley as the chart misrepresents.

1   Proxy Statement indicating that the May 2002 grants were issued pursuant to the 1998 Equity

2   Incentive Plan).  Paragraph 6(c) of the 1998 Equity Incentive Plan, states:

3       <u>Exercise Price of a Nonstatutory Stock Option.</u>  Subject to the provisions of
        subsection 5(b) regarding Ten Percent Shareholders, the exercise price of each

4       Nonstatutory Stock Option granted prior to the Listing Date shall be not less than
        eighty-five percent (85%) of the Fair Market Value of the stock subject to the

5       Option on the date the Option is granted.  The exercise price of each Nonstatutory
        Stock Option granted on or after the Listing Date shall be not less than fifty

6       percent (50%) of the Fair Market Value of the stock subject to the Option on the
        date the Option is granted.  Notwithstanding the foregoing, a Nonstatutory Stock

7       Option may be granted with an exercise price lower than that set forth in the
        preceeding sentence if such Option is granted pursuant to an assumption or

8       substitution for another option in a manner satisfying the provisions of Section
        424(a) of the Code.

9   <u>See</u> Dkt. #50, Ex. I.  Given that the share price on June 4, 2002 was only 7.2% higher than on

10  May 6, 2002, at the time the grant was recorded with the SEC, it was within the allowable

11  percentage for "in the money" options under the 1998 Equity Incentive Plan.[9]

12          As discussed above and below, plaintiffs have failed to plead with particularity that the

13  other four grants of options to the Director Defendants were backdated.  In May 2002, there

14  were 22 trading days.  <u>See</u> Dkt. #60, Ex. B.  Even if the May 6, 2002 strike price of $11.12 was

15  the lowest closing price for F5's stock during the month of May 2002 as plaintiffs allege, this

16  alone is not sufficient to show with particularity that the option was backdated.  By granting an

17  option in May of 2002, there was a 1 in 22 chance of the grant falling on May 6, 2002.

18  Furthermore, given the volatility of F5's stock during 2002, which closed at a low of $6.78 on

19  October 10, 2002 and at a high of $26.21 on March 18, 2002, the relatively modest 7.2%

20  increase in the price is not analogous to the extreme increases where courts have found a

21  particularized showing of backdating.  <u>See, e.g.</u>, <u>In re CNET</u>, 484 F. Supp. 2d at 959-61 (finding

22  that plaintiffs pleaded facts supporting an inference of backdating where there were 115.1%,

23  66.2%, and 49.7% increases in CNET's stock 20 trading days after the grants); Dkt. #60, Ex. B.

25          [9]  The SEC filing for this grant indicates that it was a Non-Qualified Stock Option grant.  <u>See</u>

26  Dkt. #60, Ex. J.

ORDER GRANTING F5'S MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND                -16-

1    Having determined that plaintiffs have not pleaded particularized facts indicating that the grants

2    dated January 1, 2001, and May 6, 2002 were backdated, the Court now turns to the remaining

3    grants dated February 13, 2003 and April 29, 2004.

4        The February 13, 2003 and April 29, 2004 grants issued after the effective date of the

5    Sarbanes-Oxley Act of 2002.  See 15 U.S.C. § 78p(a)(4).  Under Sarbanes-Oxley, directors and

6    officers transacting in their company's stock are required to file a Form 4 by the close of

7    business the second day following the transaction.  See id. at § 78p(a)(2)(c).  "As this law was

8    enacted, backdating became more difficult to pull off.  Options grants had to be recorded with

9    the SEC within two days of the grant date.  This severely curtailed the ability to go back in time

10   and change the grant date."  In re CNET, 483 F. Supp. 2d at 961.  In In re Zoran Corp.

11   Derivative Litig., 2007 U.S. Dist. Lexis 43402, *35-36 (N.D. Cal. June 5, 2007), Judge Alsup

12   discussed the post-Sarbanes-Oxley Form 4 timing requirement in the context of backdating

13   claims:

14           This is not to say that backdating is completely impossible within a [Form 4] two-
             day window (particularly when there are intervening holidays), but only to say that
15           on any given business day, the range of phony dates is restricted to only two for
             those who file on time.  In order to reach back to even earlier phony dates, the
16           Form 4 filer must submit the form late.  Therefore, a late-filed Form 4 is a red flag.
             Particularly where there is no other indication that the grant was publically
17           disclosed before it was reported to the SEC, a late-filed Form 4 is a warning
             indicator of backdating.

18   Id. (emphasis in original).

19           d.       Option grants dated February 13, 2003

20       Plaintiffs allege that on February 13, 2003, 15,000 options each were granted to directors

21   Higginson, Guelich, and Grinstein at an exercise price of $12.79.  See Complaint at ¶70.

22   February 13, 2003 was a Thursday.  Under 15 U.S.C. § 78p(a)(2)(c), a Form 4 for options

23   granted on February 13, 2003 should have been filed with the SEC by the close of business on

24   February 17, 2003.  Mr. Grinstein filed his Form 4 over a week late, on February 23, 2003.  See

25   Dkt. #60, Ex. K.  Mr. Guelich filed his Form 4 a day late on February 18, 2003.  Id.  Mr.

26

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND            -17-

Higginson, however, timely filed his Form 4 on February 15, 2003.  Id.  Given the fact that Mr. Higginson filed his Form 4 on time, plaintiffs have not shown for demand futility purposes that a majority of the directors received backdated grants on February 13, 2003.

> **e.**     **Option grants dated April 29, 2004**

Finally, plaintiffs allege that on April 29, 2004, 15,000 options each were granted to directors Higginson, Guelich, and Grinstein.  See Complaint at ¶72.  April 29, 2004 was a Thursday.  Under 15 U.S.C. § 78p(a)(2)(c), a Form 4 for options granted on April 29, 2004 should have been electronically filed with the SEC by the close of business on May 3, 2003.  See 15 U.S.C. § 78p(a)(4) (requiring that after July 30, 2003 all statements under section (a)(2) must be filed electronically).  All three directors filed their Form 4's late on Thursday, May 6, 2004, a week after the April 29, 2004 grant date.  See Dkt. #60, Ex. M.

These late filings, however, become insignificant when reviewed with the trajectory of F5's stock price after April 29, 2004.[10]  Plaintiffs allege that the exercise price for these options was $28.10, which was the closing price of F5's stock on April 29, 2004.  See Complaint at ¶72; Dkt. #60, Ex. B.  Notably, the closing price on May 6, 2004, the day the directors filed their Form 4's was $26.90, $1.20 lower than the grant date.  Accordingly, their options were "underwater" at the time of the SEC filing.  See Dkt. #60, Ex. B.  In fact, F5's stock closed lower in every trading day between April 29, 2004 and May 6, 2006, meaning the options were underwater the entire time between the grant date and the Form 4 filing date.  Id.  If the directors were attempting to backdate their options as plaintiffs contend, it is extremely unlikely that the directors would have looked into the past and chosen a day on which the price closed higher

---

[10]  Plaintiffs are admonished for their misrepresentation of F5's April 29, 2004 stock price in the chart on page 42 of the Complaint.  Based on the location of the arrow in this chart purportedly indicating the April 29, 2004 grant, it appears as if the April 29, 2004 grant was at a significant trough in price and suggests F5's stock closed below $27.00 on April 29.  In fact, F5's stock closed at $28.10 on April 29, 2004 and was not a relative low point at all.  F5's stock actually closed lower in the 16 trading days following April 29, 2004.  When plotted properly, the April 29 price is not in a valley as plaintiffs' chart incorrectly suggests.

1  than the day on which the grant was recorded with the SEC.  This decrease between the grant

2  date and the date on which the transaction was filed with the SEC undermines any allegations

3  that the April 29, 2004 grants were backdated.

4        **3.      Is there reasonable doubt that F5's Director Defendants are independent?**

5        Having found that plaintiffs have failed to establish reasonable doubt that the Director

6  Defendants are disinterested based on receipt of backdated options, the Court turns to the issue

7  of whether plaintiffs have raised reasonable doubt that the Director Defendants are independent

8  under the first part of <u>Aronson</u>'s test.  <u>See Aronson</u>, 473 A.2d at 814.  "The primary basis upon

9  which a director's independence must be measured is whether the director's decision is based on

10 the corporate merits of the subject before the board, rather than extraneous considerations or

11 influences." <u>Beam</u>, 845 A.2d at 1049.  In their Complaint, plaintiffs allege that "[i]n order to

12 bring this action for breaching their fiduciary duties, the members of the F5 Board of Directors

13 would have been required to sue themselves and/or their fellow directors and allies in the top

14 ranks of the Company, who are <u>their personal friends</u> and with whom they have entangling

15 financial alliances, interests and dependencies, which they would not do."  <u>See</u> Complaint at

16 ¶154(i) (emphasis added).  Plaintiff also alleges that "[c]ertain directors are also <u>dominated and</u>

17 <u>controlled</u> by other directors and cannot act independently of them."  <u>Id.</u> at ¶154(b) (emphasis

18 added).  These types of generalized allegations in the Complaint, however, are insufficient to

19 create reasonable doubt that F5's Director Defendants lacked independence:

20        [S]ome professional or personal friendships, which may border on or even exceed
         familial loyalty and closeness, may raise a reasonable doubt whether a director can
21       appropriately consider demand. . . . Not all friendships, or even most of them, rise
         to this level and the Court cannot make a <u>reasonable</u> inference that a particular
22       friendship does so without specific factual allegations to support such a
         conclusion.
23
   <u>Beam</u>, 845 A.2d at 1050 (emphasis in original); <u>see Aronson</u>, 473 A.2d at 816 (concluding that
24
   "[t]he shorthand shibboleth of 'dominated and controlled directors' is insufficient" to support a
25
   showing that directors lack independence).
26
   ORDER GRANTING F5's MOTION TO DISMISS
   FOR FAILURE TO MAKE DEMAND            -19-

To excuse pre-suit demand, "the plaintiff has the burden to plead particularized facts that create reasonable doubt sufficient to rebut the presumption" that the Director Defendants acted independently.  Beam, 845 A.2d at 1050.  Plaintiffs have not met this burden based on the generalized allegations in the Complaint.

### 4.   Is there reasonable doubt as to whether the challenged conduct is protected by the business judgment rule?

Under the second part of the Aronson test, plaintiffs can establish that demand was futile if they plead particularized facts creating reasonable doubt that the option grants at issue were "the product of a valid exercise of business judgment."  Aronson, 473 A.2d at 814.  Plaintiffs allege that they have created reasonable doubt on this issue because "F5's Compensation Committee members – Higginson, Guelich, Grinstein and Malone – awarded backdated option grants" and that "there is reasonable doubt that the issuance of false and misleading proxy statements and financial results was a valid exercise of business judgment."  See Response at 18, 25.  The Court also reviews here plaintiffs' contention that demand was futile because the Director Defendants Higginson, Guelich, Grinstein, and Malone "face a substantial likelihood of liability" as members of F5's Compensation Committee and defendants Higginson, Guelich and Grinstein "face a substantial likelihood of liability based on their conduct as members of the Audit Committee."  See Response at 20-24.  Plaintiffs also contend that demand is excused because "[i]n order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and . . . [t]his they will not do."  See Complaint at ¶154(g).

The Court finds that plaintiffs have failed to plead particularized facts creating reasonable doubt whether the decisions surrounding the option grants at issue were a valid exercise of business judgment.  First, "[i]t is no answer to say that demand is necessarily futile because (a) the directors 'would have to sue themselves, thereby placing the conduct of the litigation in hostile hands,' or (b) that they approved the underlying transaction."  Brehm v. Eisner, 746 A.2d 244, 257 n.34 (Del. 2000) (quoting Aronson, 473 A.2d at 817-18).  Second, plaintiffs provide no

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND                  -20-

particularized allegations showing that Director Defendants Higginson, Guelich, Grinstein, and Malone chose the date on which the allegedly backdated options were to be granted or that they knew a grant's true date. See In re CNET, 483 F. Supp. 2d at 965. Plaintiffs' allegations that because Director Defendants Higginson, Guelich, Grinstein, and Malone were on the Compensation Committee and Audit Committee, they must have known, "do not constitute particularized facts." Id. at 966. "[W]here plaintiffs merely allege that approval was given without more, the facts pleaded simply do not support the inference that . . . board members were not independent or disinterested or that their decisions were not protected by the business judgment rule." Id.

Furthermore, plaintiffs' allegations that demand is excused because the Director Defendants face a likelihood of liability fails, because in Aronson, the court held that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterested of the directors" Aronson, 473 A.2d at 815. Accordingly, a "plaintiff may not bootstrap allegations of futility by pleading merely that the directors participated in the challenged transaction or that they would be reluctant to sue themselves." In re Sagent Tech., Inc., Derivative Litig., 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003) (citations omitted).

Finally, even if as plaintiffs allege:  (1) the Director Defendants who were also members of the Compensation Committee awarded the option grants at issue; and (2) the Director Defendants who were also members of the Audit Committee reviewed and approved financial statements and disclosures that included information about the grants; and (3) the Director Defendants issued Proxy Statements and financial results that included information about the grants, all of these allegations challenging whether the actions of the Director Defendants represent exercises of valid business judgment must be viewed against the backdrop of

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND          -21-

plaintiffs' failure to make a particularized showing that options were in fact backdated.[11]  See Response at 20, 22, and 25.  As discussed in Section II.B.2 above, plaintiffs have failed to show that the five grants of options received by the Director Defendants were backdated.  Given that these grants represent five of the twelve challenged grants, plaintiffs have failed to support their strident claim that F5's "astonishing multi-year pattern of stock option grants on dates with highly favorable exercise prices . . . indicates that the purported grant dates of stock options were not the actual dates on which the option grants were made [but] [r]ather, the pattern indicates that the grants were repeatedly backdated to dates with exceedingly low stock prices." See Complaint at ¶60 (emphasis added).  On this point, Judge Chesney's opinion in In re Linear Tech. Corp. Derivative Litig., 2006 U.S. Dist. Lexis 90986, at *8-9 (N.D. Cal. 2006), is instructive:

> With respect to the allegation of "backdating," the only factual allegation offered by plaintiffs is that on seven occasions over a period of seven years, stock options were dated "just after a sharp drop" in Linear's stock and "just before a substantial rise," which, plaintiffs allege, constitutes a "striking pattern that could not have been the result of chance."  Because plaintiffs provide no facts as to how often and at what times the Committee Defendants have granted stock options in the past, no "pattern," let alone a "striking" one, is apparent.

It is the same in this case.  Although plaintiffs here claim that options granted on twelve dates were backdated, plaintiffs failed to plead any facts as to when any other options were granted, or under what circumstances they were issued.  Nor do they plead any particularized facts regarding the Director Defendants' actual involvement in granting the options.  In their response, plaintiffs contend that the Complaint adequately alleges stock option backdating because they "employed a statistical model that combined those used by various academic articles that have studied stock option granting practices."  See Response at 14.  The Complaint

---

[11]  For this reason, plaintiffs' argument that demand is futile in this case because "defendants' illegal stock option backdating was an ultra vires act" also fails.  See Response at 27.

on its face, however, does not appear to be based on any type of statistical model.[12]  The only

reference to a statistical review is plaintiffs' assertion that "11 of the 25 stock option grants to

F5's directors and top officers came at monthly lows in F5's share price.  The odds of that

happening by change [sic] are less than 1 in 90 million."  See Complaint at ¶2; see also ¶8

("[M]any stock option grants to F5's directors and top officers came at monthly lows in F5's

share price.  The odds of that happening by chance are less than 1 in 90 million.").

Significantly, the 1 in 90 million and the "11 of the 25 stock option grants" figures are not tied

to, or harmonized with, the other allegations in the Complaint.[13]  Adding further confusion is the

different allegation presented by plaintiffs on August 1, 2007 at oral argument.  Instead of

tracking the allegation in the Complaint that "11 of the 25" stock option grants occurred at

monthly lows, at oral argument, plaintiffs now contend that there are publically disclosed grants

by F5 on 32 different days and that grants on 10 of these days[14] are backdated because they

occurred on days of the month when F5's stock closed at a relative monthly low.  This lack of

_____

[12]  In the Complaint, plaintiffs rely on an examination of the "20-day cumulative return based on
the exercise price" as a metric to support their contention that grants on twelve specific dates have been
backdated.  See Complaint at ¶¶ 62 - 73.  While the 20-day analysis may have been used in the articles
cited by plaintiffs in the Complaint, in this case, the fact that the options granted on eight of the twelve
dates were reported to the SEC before 20 closing days passed, renders the 20-day cumulative return
analysis meaningless for these grants.  See Dkt. #60, Ex. D, G -  I, K - N (Forms 4, and one Form 3, for
grant dates February 10, 2000; March 16, 2001; April 20, 2001; April 27, 2001; February 13, 2003; May
8, 2003; April 29, 2004; and April 30, 2004); Response at n.9 ("Stated differently, the stock price 20
days after the option grant date is only relevant for purposes of plaintiffs' claims if the defendants looked
back from that 20th trading day to pick the exercise price.").

[13]  Plaintiffs expressly contest grants on twelve specific dates.  See Complaint at ¶9.  Based on
plaintiffs' allegations, seven of these twelve dates were the lowest closing price for the month, not eleven.
Id.  Furthermore, it is unclear what the "25 stock option grants" refers to.  In paragraph 9 of the
Complaint, plaintiffs contest 48 individual grants on the twelve suspect dates.  Other than the cursory
reference to 25 grants in paragraph 2, there are no other allegations connecting the reference to "25 stock
option grants" to the rest of the Complaint.

[14]  At oral argument, plaintiffs represented that on 7 of the 32 days when publically disclosed
options were granted, F5's stock closed at the monthly low.  Plaintiffs also represented that on 3 of the
32 days, F5's stock closed at the second lowest price for the month.

consistency in plaintiffs' claims undermines any particularized showing.

For all of these reasons, plaintiffs have failed to plead particularized facts creating reasonable doubt that the option grants at issue were the product of a valid exercise of business judgment.

### 5.    Demand is required for claims raised under §14(a)

In their response, plaintiffs contend that even if they have failed to show that demand was excused as futile, the claims for false or misleading annual proxy statements raised under § 14(a) of the Exchange Act must be allowed to proceed because these claims do not require pre-suit demand.  See Response at 29 (citing Vides v. Amelio, 265 F. Supp. 2d 273 (S.D.N.Y. 2003), for the proposition that demand is not required for a derivative §14(a) claim).  Although the Ninth Circuit has not yet considered this issue, the weight of authority, including recent authority from the same district that decided Vides, has disregarded this argument.  See In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 606 n.17 (S.D.N.Y 2007) ("Because derivative plaintiffs' claim pursuant to Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), is premised on the same allegations of wrongdoing, it is also dismissed for failure to plead demand futility with adequate particularity."); In re CNET, 483 F. Supp. 2d at 966 ("The weight of the authority supports requiring plaintiffs to make a demand or plead that demand was futile in alleging a claim under Section 14(a)").  Accordingly, the Court rejects plaintiffs' contention that their §14(a) proxy statement claims should proceed even without a particularized showing of demand futility.

### 6.    F5's formation of the Special Committee does not excuse demand

Plaintiffs also argue that demand is excused in this case because they claim that F5 delegated control of this litigation to a Special Committee and state: "[b]y delegating the decision to the Special Committee to act for the Board in responding to the backdated stock option litigation, F5's directors implicitly acknowledged that the complete Board cannot disinterestedly make such a determination and that a pre-suit demand is not required."  See

Response at 29.  Plaintiffs' generalized allegations regarding F5's formation of a Special Committee to conduct a review of the company's stock option practices, however, does not excuse demand.

"[A] disinterested board of directors does not waive its right to control derivative litigation merely by delegating that control to a special committee.  For this Court to find that a board of directors conceded the futility of demand, a derivative plaintiff must allege particularized facts that support a factual finding that the board made the concession." Seminaris v. Landa, 662 A.2d 1350, 1353 (Del. Ch. 1995).  In this case, F5's Special Committee was formed two weeks before the lawsuit was filed and, based on the disclosure in F5's 2005 Form 10-K/A, it had authority to "conduct a review of [F5's] stock option practices, including a review of [F5's] underlying stock option documentation and procedures").  See Dkt. #50, Ex. B. There has been no showing by plaintiffs that in forming this committee, the Director Defendants intended to concede the futility of demand.

Plaintiffs' reliance on Abbey v. Computer & Comm. Tech. Corp., 457 A.2d 368 (Del. Ch. 1983) is unavailing.  In Abbey, the plaintiff made demand on the board and then filed suit claiming that demand was excused.  Id. at 370.  In response to the demand, the board established a one-man special litigation committee.  Id. at 371.  Here, plaintiffs did not make a demand, and F5's Special Committee was formed before the lawsuit was filed, not in the face of plaintiffs' lawsuit or a demand.  See Spiegel v. Buntrock, 571 A.2d 767, 777 (Del. 1990) (rejecting the argument that "Abbey stands for the proposition that a board of directors, ipso facto, waives its right to challenge a shareholder plaintiff's allegation that demand is excused by the act of appointing a special litigation committee").  Furthermore in allowing the suit to proceed, the Abbey court distinguished a scenario where, as here, a board "appointed a committee to investigate the allegations and to report back to the board for whatever action the board might choose to take on the merits of the charges[.]"  Abbey, 457 A.2d at 374.

The other cases cited by plaintiffs are also distinguishable.  In Peller v. Southern Co., 911

F.2d 1532, 1537 (11th Cir. 1990), a committee was appointed after the lawsuit was filed and the board "delegated to it the sole authority to evaluate the merits of the suit and determine the Companies' response." Similarly, in In re FirstEnergy S'holder Derivative Litig., 320 F. Supp. 2d 621, 627 (N.D. Ohio 2004), an "independent committee" was formed after the complaint was filed. In this case, the Special Committee was in place to review F5's stock option practices before the lawsuit was filed, and there are no facts showing that the Committee was charged with evaluating the merits of the lawsuit after it was filed. Therefore, plaintiffs' argument that F5's formation of the Special Committee excused demand fails.

### III.  CONCLUSION

For all of the foregoing reasons, the Court finds that it would not have been futile for plaintiffs to make a demand on F5's directors. Accordingly, the Court GRANTS defendant "F5 Networks, Inc.'s Motion to Dismiss for Failure to Make Demand" (Dkt. #49). Plaintiffs are granted LEAVE TO AMEND their Complaint within twenty (20) days from the date of this order.

DATED this 6th day of August, 2007.

Robert S. Lasnik
United States District Judge

ORDER GRANTING F5's MOTION TO DISMISS
FOR FAILURE TO MAKE DEMAND          -26-